# 10-1372-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆ ◆

THEFLYONTHEWALL.COM, INC.,

*Defendant-Appellant*,

—against—

BARCLAYS CAPITAL INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., and MORGAN STANLEY & CONWAY, INC.,

*Plaintiffs-Appellees*.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF *AMICUS CURIAE* OF REED ELSEVIER INC.
IN SUPPORT OF AFFIRMANCE**

CHRISTOPHER A. MOHR
  *\*Counsel of Record*
MEYER, KLIPPER & MOHR, PLLC
923 15th Street, N.W.
Washington, D.C. 20005
(202) 637-0850

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Reed Elsevier Inc. discloses that it is a private company, the shares of which are ultimately owned by Reed Elsevier PLC, which is traded on the London stock exchange, and Reed Elsevier NV, which is traded on the Euronext Amsterdam exchange.  In addition to their respective listings on the London and Euronext Amsterdam stock exchanges, both parent companies have ADRs traded on the New York Stock Exchange.  No publicly held entity owns 10% or more of Reed Elsevier PLC or Reed Elsevier NV.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF CONSENT TO FILING ............................................ vi

INTEREST AND IDENTITY OF THE AMICUS ................................... 1

SUMMARY OF ARGUMENT .............................................................. 4

ARGUMENT ....................................................................................... 6

I.  *FEIST* DOES NOT PREVENT STATE OR FEDERAL
LAW FROM PROTECTING DATABASES OR OTHER
INFORMATION SERVICES FROM UNFAIR
COMPETITION ................................................................................. 6

   A.  *Feist* Contemplates the Existence of Unfair Competition
Laws that Apply to Material Not Covered by Copyright. ................... 10

   B.  States Are Fully Empowered to Use Their Police Powers
in Areas That Congress Has Not Occupied. ..................................... 14

II.  AMICI'S REQUEST THAT THIS COURT REVERSE
*NBA* IS BARRED BY SECOND CIRCUIT PRECEDENT ................... 16

III. LAWS PROTECTING INFORMATION SERVICES
FROM DESTRUCTIVE, ANTICOMPETITIVE BEHAVIOR
ARE CONSISTENT WITH THE FIRST AMENDMENT. ...................... 17

IV.  CONCLUSION ............................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Assoc. Press v. All Headline News Corp.*, 608 F. Supp. 2d
454 (S.D.N.Y. 2009)...................................................................... 15, 16

*Banxcorp v. Costoco Wholesale Corp.*, 2010 U.S. Dist.
Lexis 70380 (S.D. N.Y. July 14, 2010) ................................................ 8

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...................................... 20, 21

*Bond Buyer v. Dealers Digest Publg Co., Inc.*, 25 A.D.2d
158 (N.Y. App. Div. 1966).......................................................... 15, 19

*C.B.C. Distribution & Mktg., Inc. v. MLB Advanced
Media*, 505 F.3d 818 (8th Cir. 2007)................................................ 21

*eBay, Inc. v. Bidders Edge, Inc.*, 100 F. Supp. 2d 1058
(N.D. Cal. 2000) ...................................................................... 7

*EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577
(1st Cir. 2001)......................................................................... 8

*Feist Publications, Inc., v. Rural Telephone Service Co.*,
499 U.S. 340 (1991) ............................................................ passim

*Florida Star v. B.J.F.,* 491 U.S. 524 (1989) ...................................... 20, 21

*Forest2Market, Inc. v. Am. Forest Mgmt.*, 05-cv-423,
2008 U.S. Dist. LEXIS 33185 (W.D.N.C. April 21,
2008) ............................................................................... 15, 16

*Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone,
Inc.*, 73 F. Supp. 2d 1044 (E.D. Mi. 1999)................................... 15, 16

*Gelman v. Ashcroft*, 372 F.3d 495 (2d Cir. 2004) ................................ 16

*Goldstein v. California,* 412 U.S. 546 (1973).......................................................... 13

*International News Service v. Associated Press*, 248 U.S.
   215 (1918)............................................................................................ 11, 12, 18

*Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470  (1974) ...................................... 13

*Lynch, Jones & Ryan, Inc. v. Standard & Poor's*, 1998
   N.Y. Misc. LEXIS 334 (N.Y. Sup. Ct. June 15, 1998) ................................. 15, 16

*Matthew Bender & Co. v. Jurisline.com LLC*, 91 F. Supp.
   2d 677 (S.D.N.Y. 2000)...................................................................................... 8

*Mercury Records Prod. Inc. v. Econ. Consultants, Inc.*,
   218 N.W. 2d 705(Wisc. 1974), *cert. denied* 420 U.S.
   914 (1974)......................................................................................................... 13

*Pittsburgh Pirates Co. v. KQV Broad. Co.*, 24 F. Supp.
   490 (W.D. Pa. 1938) ......................................................................................... 14

*Pollstar v. Gigmania Ltd.*, 170 F. Supp. 2d 974 (E.D.
   Cal. 2000) .................................................................................................... 15, 16

*Pottstown Daily News Publg Co. v. Pottstown Broad.
   Co.*, 247 F. Supp. 578 (E.D. Pa. 1965) ............................................................ 14

*Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393 (2nd Cir.
   2004) ................................................................................................................. 22

*S. F. Arts & Ath. v. U. S. Olympic Comm.,* 483 U.S. 522
   (1987).................................................................................................................. 19

*Sarl Louis Feraud Int'l v. Viewfinder,* 489 F.3d 474 (2d.
   Cir. 2007)........................................................................................................... 19

*Scranton Times, L.P. v. Wilkes-Barre Publ'g Co,* No. 08-
cv-2135, 2009 U.S. Dist. LEXIS 87261 (M.D. Pa. Sept.
23, 2009) .............................................................................................. 15, 16

*Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d
1450 (2nd Cir. 1996) ...................................................................... 22

*Smith v. Daily Mail Publ'g Co.,* 443 U.S. 97 (1979)...................................... 20, 21

*Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.*,
683 F.2d 704 (2nd Cir. 1982) ...................................................... 15, 16

*Stewart Title of Cal. v. Fidelity Nat'l Title Co.,* 279 Fed.
Appx. 473 (9[h] Cir 2008) .............................................................. 15, 16

*The National Basketball Ass'n v. Motorola, Inc.*, 105
F.3d 841 (2nd Cir. 1997) ............................................................. passim

*United States v. Martignon,* 492 F.3d 140 (2d Cir. 2007) ...................................... 11

*United States v. O'Brien,* 391 U.S. 367 (1968)...................................................... 20

*Warren Publg. v. Microdos Data Corp.*, 115 F.3d 1509,
(11th Cir. 1997) (*en banc*), *cert. denied* 522 U.S. 963
(1997)...................................................................................................... 9

*Zacchini v. Scripps-Howard Broad. Co.,* 433 U.S. 562
(1977)...................................................................................................... 18, 19

## Statutes

15 U.S.C. § 1051 ...................................................................................... 11

17 U.S.C. § 301 ........................................................................................ 13

18 U.S.C. § 1030...................................................................................... 12

## Other Authorities

1 M. Nimmer & D. Nimmer, *Copyright* (1990) .................................................... 12

2 J. Thomas McCarthy, *McCarthy on Trademarks and
    Unfair Competition* ....................................................................................... 13, 14

J.H. Reichman & Pamela Samuelson, *Intellectual
    Property Rights in Data*, 50 VAND. L. REV. 51 (1997) ....................................... 8

LAURA D'ANDREA TYSON & EDWARD F. SHERRY,
    STATUTORY PROTECTION FOR DATABASES: ECONOMIC
    AND PUBLIC POLICY ISSUES (1997), *available at*
    http://judiciary.house.gov/legacy/41118.htm (last
    visited July 9, 2010). .......................................................................................... 3

*The Collections of Information Antipiracy Act, Hearings
    on H.R. 2652 Before the Subcomm. on Courts and
    Intellectual Property of the House Comm. on the
    Judiciary*, 105th Cong. (1998) ............................................................................. 7

*The Collections of Information Anti-Piracy Act: Hearing
    on HR 2652 Before the Subcomm. on Courts and
    Intellectual Property of the H. Judiciary Comm.*, 105th
    Cong. (1997) ........................................................................................................ 9

 http://info.scopus.com/scopus-training/how/ ........................................................ 2

http://www.micromedex.com/products/poisindex ................................................... 9

## Constitutional Provisions

U.S. CONST. art. I, § 8, cl. 8 ............................................................................... 6, 10

## STATEMENT OF CONSENT TO FILING

Amicus is authorized to file brief pursuant to Fed. R. App. P. 29(a), as all parties have consented to its filing.

## INTEREST AND IDENTITY OF THE AMICUS[*]

Reed Elsevier Inc. provides information services to legal, business, professional and academic communities, as well as law enforcement agencies and other government bodies.  It publishes journals, legal, educational, medical and business information, reference books and textbooks, business magazines, and fact-laden databases such as LexisNexis.  LexisNexis supports more than 3.6 million users in the law enforcement, university, and professional communities, who rely on its fact-based compendium of the statutes, case law, regulations, and public records of all fifty states and the federal government (including property title records liens, and tax assessor records) on a daily basis.  Elsevier, which publishes science and health information, offers a number of constantly updated database products including Scopus, the largest abstract citation database[1] of peer-reviewed literature; *Strategic Transactions,* which delivers comprehensive data on healthcare deal-making, start-ups, and marketplace trends; and Inteleos, which features

---

[*]  Pursuant to Local Rule 29.1(b), no portion of this brief has been authored, in whole or in part, by a party or counsel for any party.  Neither counsel for a party nor a party has contributed money intended to fund the preparation or submission of this brief.  The sole entity that has contributed money to the preparation or submission is the one whose name appears on the cover.

[1]  An "abstract citation database" provides access to a synopsis of a given article, as well as every qualified publication that cites that article.  *See generally*

1

comprehensive data and in-depth, timely reports on thousands of drugs, vaccines, gene therapies, and similar medical technologies, from their preclinical testing through their FDA approval and beyond.

Reed Elsevier also offers a number of products whose value depends on a "time-sensitive" window of exclusivity:

- ICIS.com, a real-time news service providing news and information that is updated 24-hours-a-day regarding the chemical industry. ICIS also issues daily price reports for over 120 chemical commodities.

- The Pink Sheet Daily, an online, constantly-updated news service on the biopharmaceutical industry.

- Health News Daily, provides and analyzes the latest developments in the biopharmaceutical, device, diagnostics, over-the-counter drugs, and supplements industries, including regulatory and legislative developments, R&D, reimbursement and corporate transactions.

- PharmAsia News provides 24-hour updates on legal and business developments affecting pharmaceutical, biologics, and medical device manufacturers doing business in Asia and other nations of the Pacific Rim.

- Elsevier's International Medical News Group provides a daily, online medical news wire service featuring breaking news, journal summaries, and feature stories from medical experts that reaches over 500,000 physicians.

Reed Elsevier has invested and continues to invest billions of dollars in the collection, organization, and verification of the information provided through these

---

http://info.scopus.com/scopus-training/how/.

services in print, email, and via the internet.[2]  *Amicus* relies on laws passed by

Congress and the state legislatures for protection against illegal unauthorized uses

of these fact-based services.

Reed Elsevier submits this brief for two reasons.  First, *amicus* writes

because *amici* Google and Twitter (hereinafter "Google") have read the Supreme

Court's decision in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499

U.S. 340 (1991), in a manner that questions the constitutionality of both the "hot

news" doctrine and a number of other state laws (and logically federal statutes as

well) on which *amicus* currently rely for protection of their information products

---

[2]     [C]ompeting in the ever-expanding market to meet the modern
demand for information has become expensive.  A considerable
amount of time, money and effort is required to construct and
maintain a database-the need for the information must be identified; it
must be generated and compiled, verified for accuracy, searched for
errors, organized for use and interoperability with other hardware and
software products, and continuously updated over time.  Innovations
in Internet and computer technologies have made these last two
features critical for today's users.  Database providers must vigorously
invest in their products to keep them functioning at state-of-the-art
efficiency. Databases must be reconstructed to accommodate new
conventions in computing power, new ways of "linking" to other
electronic data (for example on the Web), and the exponential growth
in the size of the data sets themselves.

LAURA D'ANDREA TYSON & EDWARD F. SHERRY, STATUTORY PROTECTION FOR
DATABASES: ECONOMIC AND PUBLIC POLICY ISSUES (1997), *available at*
http://judiciary.house.gov/legacy/41118.htm (last visited July 9, 2010).

and services.  Second, Google appears to take the position that the First Amendment categorically bars the misappropriation doctrine from applying to factual information.  As a creator of continually updated databases, morning news alerts and other time-sensitive publications, and an entity that supported enactment of a federal misappropriation law that many of appellant's *amici* opposed, *amicus* cannot allow these erroneous and irresponsible propositions to go unanswered.

## SUMMARY OF ARGUMENT

*Amicus* provides and publishes a variety of information services, including continually updated databases of case law, medical journals and information, public records, and corporation transaction data in a variety of different fields.  The collection of the information contained in these services, some of which constitutes "hot news," is time consuming and enormously expensive.

If the states, through the exercise of their police power, wish to protect the compilers of these information services from acts of unfair competition, they are constitutionally permitted to do so.  Google's position that the Supreme Court's *Feist* decision created a broad constitutional rule that renders the states broadly incapable of addressing the misappropriation of factual information is simply unsustainable.  *Feist* expressly recognizes the potential applicability of unfair competition law to unauthorized takings of factual information.  Moreover, if

4

Google's position were correct, a whole host of economic harms could occur, and the states could not stop them no matter what the consequences, through, for example, employing doctrines such as computer trespass or trespass to chattels.

*Feist* does not reach so broadly. Although the *Feist* decision might set the limits on what a federal copyright law must contain to comport with constitutional requirements, the Supreme Court has recognized that the Copyright Clause places no inherent limits on the states. States may—and have—used unfair competition law to protect producers of information in many different circumstances in areas that the copyright law has not reached. The relevant question in such cases becomes whether Congress, acting through its enumerated copyright power, has preempted the state cause of action. This Court already answered that question in the negative in *NBA v. Motorola*.

The First Amendment does, of course, limit the extent to which a state doctrine may limit the retransmission of speech. States, however, have a substantial and legitimate interest in preserving the incentives for gatherers of information to continue to invest in their services and make their products available to the public. The misappropriation doctrine, which is concerned with the protection of those incentives from acts of destructive unfair competition, remains entirely unconcerned with particular viewpoints or ideas that may be expressed in

5

that information.  As such, it is content and viewpoint-neutral, and subject to intermediate First Amendment scrutiny.  The five-part test set forth in this Court's *NBA* decision represents one permissible, narrowly tailored way of balancing the state's interest in maintaining incentives to disseminate information and the public's interest in having access to that information.  Given the demonstrated harm to the appellees, the appellant's conduct during this trial, and the fact that the appellees make their information broadly available to the public, the District Court stayed well within its discretion to enjoin the defendant's activity.

## ARGUMENT

### I.    *Feist* Does Not Prevent State or Federal Law from Protecting Databases or Other Information Services From Unfair Competition.

Google, relying on *Feist Publications, Inc. v. Rural Telephone Service Co.*("*Feist*"), 499 U.S. 340 (1991), has taken the position that the "dissemination of factual information may not be enjoined absent a contractual or other special relationship," and that the states are therefore powerless to regulate the re-dissemination of information not subject to copyright, absent such a contractual or similar relationship. (*See* Google Br. at 4.)  It argues that *Feist* and its interpretation of the Constitution's Copyright Clause, U.S. CONST. art. I, § 8, cl. 8,

pose an insurmountable bar to any state law that would prevent wholesale copying of factual, non-copyrightable content.  (*See* Google Br. at 6-8.)

If that view of the constitutional landscape is correct, the ability of Reed Elsevier and others who invest substantial time, money, and effort into producing valuable fact-based databases to protect against the devastating economic effects of wholesale copying of the non-copyrightable contents of their products and services would be damaged severely.  Such an interpretation of *Feist* and the Copyright Clause would cast doubt on state laws and doctrines including those regulating (1) the type of "hot news" misappropriation protection at issue here or (2) trespassing on computer networks, *e.g., eBay, Inc. v. Bidders Edge, Inc.*, 100 F. Supp. 2d 1058, 1069-70 (N.D. Cal. 2000) (upholding injunction on scraping of publicly available pricing information under trespass to chattels theory)—laws that regulate economically destructive activity pertaining to factual information.  Furthermore, although contracts are a valuable tool in protecting fact-based products and services, they offer no protection whatsoever in the absence of privity.[3]  *E.g.*,

---

[3] "Once the information is accessed by someone not bound by the contract, any control over misuse is lost irrevocably."  *The Collections of Information Antipiracy Act, Hearings on H.R. 2652 Before the Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary*, 105th Cong. 9 (1998) (statement of Robert E. Aber, Senior Vice President and General Counsel, the NASDAQ Stock Market, Inc., on behalf of the Information Industry Association).  Moreover, it has been recognized that "[e]ven contract law has significant limitations when mass-marketed information products are sold to persons not in privity with the makers."

*Banxcorp v. Costco Wholesale Corp.*, 2010 U.S. Dist. Lexis 70380, at *2, 41-47 (S.D. N.Y. July 14, 2010)(upholding hot news claim against entity not in privity with plaintiff).

Under Google's theory, absent any kind of contractual or similar "special relationship," legislators would be constitutionally banned from preventing unlimited commercial harm in a number of situations, including where a party:

- Obtained a required password and engaged in wholesale competitive copying and distribution of Lexis's case law collection and ICIS' pricing reports; [4]

- Left the employ of an original compiler, took critical factual information from its database, and launched a competing business without incurring the significant expenses incurred by the original compiler in developing the pilfered information; [5]

- Surreptitiously obtained valuable, time sensitive pricing information from employees of a database owner, and competed unfairly against the original compiler—much like Fly was found to have done here;

---

J.H. Reichman & Pamela Samuelson, *Intellectual Property Rights in Data*, 50 Vand. L. Rev. 51, 137 (1997).

[4] *Cf. Matthew Bender & Co. v. Jurisline.com LLC*, 91 F. Supp. 2d 677, 678 (S.D.N.Y. 2000) (taking of noncopyrightable portions of a database containing case law and offering competing product in violation of shrinkwrap contract).

[5] *Cf. EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 579-80 (1st Cir. 2001) (finding a violation of the Computer Fraud and Abuse Act where employee used former employer's proprietary information in violation of contract provision to copy travel-package prices and launch a competitive business).

- Systematically scraped hot news sites such as Pink Sheet Daily and Health News Daily, and other Reed Elsevier fact-laden sites, and re-disseminate their uncopyrightable content in competition with Reed Elsevier.

- Checked out a hard copy of a fact-laden compilation from a public library, scan its non-copyrightable contents, and offer a competing product.[6]

- Copied the contents of a database such as Poisindex[7]—a compilation of poisons, their effects, and their antidotes, designed to help emergency room and poison center personnel detect and treat toxicological exposures—and market a competing product without incurring the enormous expenses associated with such a venture.

Google's flawed invitation to "clarify" the application of *Feist* in this Circuit should be rejected. The core of its position represents a complete dismissal of the business reality that these and other fact-laden information sources do not appear out of thin air, but instead require the maintenance of incentives so that their producers may continue to make them available to the public. Google's suggestion that *Feist* renders states constitutionally incapable of addressing destructive acts of unfair competition finds no support either in *Feist* or elsewhere in the Supreme

---

[6] *See e.g., Warren Publg. v. Microdos Data Corp.*, 115 F.3d 1509, 1512-14 (11th Cir. 1997) (*en banc*) (finding no copyright infringement found where defendant obtained print copy of plaintiff's database from library, inputted entire contents of plaintiff's fact-based directory, including false information inserted in original to detect copiers, and marketed it as its own product), *cert. denied* 522 U.S. 963 (1997); *see also The Collections of Information Anti-Piracy Act: Hearing on HR 2652 Before the Subcomm. on Courts and Intellectual Property of the H. Judiciary Comm.*, 105th Cong. 25 (1997) (statement of Paul Warren of the Coalition Against Database Piracy).

[7] *See* http://www.micromedex.com/products/poisindex.

Court's jurisprudence.

### A.    *Feist* Contemplates the Existence of Unfair Competition Laws that Apply to Material Not Covered by Copyright.

*Feist's* construction of the Copyright Clause places no limits on New York's ability to use its "hot news" misappropriation tort to prevent competitive activity that it deems destructive or unfair.  States are fully empowered to prevent the re-distribution of factual information, whether a contractual relationship exits or not.  Google's argument to the contrary requires both a gross over-reading of *Feist*, and a misunderstanding of the nature of Congress's power under the Copyright Clause.

In *Feist,* the Supreme Court rejected the "sweat-of-the-brow" approach as inconsistent with Congress's authority under its copyright power, U.S. Const. Art. 1, § 8, cl. 8, and held that a factual compilation can enjoy copyright protection only if sufficient originality is present in the manner in which the facts are selected, coordinated, or arranged.  499 U.S. at 348.  Google asserts that *Feist* represents far more than an authoritative interpretation of the Copyright Clause.  *Feist*, it argues, creates an absolute "Public Domain" precluding "any claim of a property right in those facts" (Google Br. at 9), and focuses on language in that case stating that although copyright cannot protect facts, such a result was neither "unfair nor unfortunate," 499 U.S. at 350, but instead a product of copyright's constitutional

design.  *See id.* at 349.[8]

    *Feist* certainly places limitations on what a *copyright* statute may do in terms of protecting facts, but falls far short of supporting the broad rule that Google would urge.  Under *Feist, copyright* protection is not available for unoriginal collections of facts because the protection of such material does not fall within the limited purpose of the Copyright Clause, which is to encourage and reward artistic originality.  Protection against misappropriation in cases like *International News Service v. Associated Press* ("*INS*"), 248 U.S. 215 (1918) rewards neither originality nor creativity, but instead prevents unfair business practices—protection that does not turn on the presence of copyrightability.  Several portions of *Feist* make this point unequivocally plain.

    First, the unanimous *Feist* Court expressly acknowledged that *non-copyright* based protections may be available to protect fact-based materials in certain

---

[8]  Taken to its logical conclusion, this argument trumps not only state protections for factual materials, but federal ones as well.  Its reach would encompass the application of a vast array of existing federal statutes that today offer protection for factual collections, including the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  Importantly, as this court held in *United States v. Martignon*, *Feist* does not necessarily bar Congress from using its Commerce Clause authority to offer protections that it could not authorize under its Copyright Clause power, 492 F.3d 140, 148-149 (2d Cir. 2007).  In reversing the District Court, this Court ruled that the federal criminal bootlegging statute represented a valid exercise of Congress's authority under its

circumstances.  Specifically, the *Feist* opinion approvingly quotes a passage from

*Nimmer on Copyright*, stating that "[p]rotection for the fruits of [factual] research .

. . may in certain circumstances be available under a theory of unfair competition."

499 U.S. at 354 (citing 1 M. Nimmer & D.  Nimmer, *Copyright § 3.04*, p. 3-2

(1990)).  To put it mildly, it strains credulity to believe that all nine members of the

Court viewed their opinion as barring all non-copyright protections for the

production of factual compilations when including this express language.[9]

Whatever the limitations that the Copyright Clause places on federal copyright

protection of factual collections, unfair competition remedies may still be invoked

to thwart unfair and destructive takings of factual materials.

Second, *Feist's* holding that unoriginal factual compilations cannot

constitutionally qualify for federal copyright protection does not preclude New

York from applying its own statutes or common law to combat commercial

misappropriation.  The limitations placed on Article I of the Constitution on the

power delegated to Congress by that article are limitations that apply to Congress,

---

commerce powers, notwithstanding the fact that it covered material that would not
be protected under the Copyright Clause.

[9]  *See id.* at 354 n.* (noting that in *INS*, the  Court granted an injunction on grounds
 "not relevant" in the case before it).  *Amicus* respectfully submits that the reason
for that irrelevance is simple: the application of the misappropriation doctrine to
unfair business practices has nothing to do with copyright.  *See Int'l News Serv. v.
Assoc. Press*, 248 U.S. 215, 235-36 (1918).

not the States.  As the Supreme Court unambiguously explained in *Goldstein v. California,* 412 U.S. 546 (1973), the Constitution's Copyright Clause "enumerates those powers which have been granted to Congress; *whatever limitations have been appended to such powers can only be understood as a limit on congressional, and not state, action." Id.* at 561 (emphasis supplied); s*ee also*, *e.g.*, *Mercury Records Prod., Inc. v. Econ. Consultants, Inc.*, 218 N.W. 2d 705, 714-15 (Wisc. 1974), *cert. denied* 420 U.S. 914 (1974);  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 10:57 (describing *Goldstein* as having put the "Constitutional power question to rest"); 10:58 (describing state court acceptance of *Goldstein*).

*Feist* simply has no bearing on whether misappropriation can apply under state law.  Where State protections are concerned, therefore, the relevant question is not whether a particular State cause of action is at odds with the limitations placed by the Constitution on Congress's *copyright* authority, it is whether Congress chose to preempt State protection when it enacted section 301 in 1976.[10] *See* 17 U.S.C. § 301.  That is why this court in *NBA* properly considered whether a State could provide common-law misappropriation protection for non-

---

[10]  *See also Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 478-79 (1974) (noting that the states are entitled to take a diverse viewpoint in protecting intangible rights, provided that "they do not conflict with the operation of the laws in this area passed by Congress").

copyrightable facts, or whether such state protection was, instead, preempted by §

301 of the federal Copyright Act. *The National Basketball Ass'n v. Motorola, Inc.*

("*NBA*"), 105 F.3d 841, 852 (2nd Cir. 1997).

**B.      States Are Fully Empowered to Use Their Police Powers in Areas That Congress Has Not Occupied.**

Since *INS,* in the absence of preemptive federal regulation, state law can and

has provided remedies against market-destructive activity in areas where Congress

has failed to act. *See generally, e.g.,* 2 J. Thomas McCarthy, *McCarthy on*

*Trademarks and Unfair Competition* § 10:51 (describing the misappropriation tort

in general terms and collecting cases). In particular, post-*INS*, courts have

recognized misappropriation causes of action in a variety of contexts involving

misappropriations of fact-based information, such as a radio station's systematic

regurgitation of the local newspaper's accounts of the day, *Pottstown Daily News*

*Publg Co. v. Pottstown Broad. Co.*, 247 F. Supp. 578, 579 (E.D. Pa. 1965), play-

by-play announcement of a Pittsburgh Pirates game by radio announcers stationed

on nearby buildings overlooking the field, *Pittsburgh Pirates Co. v. KQV Broad.*

*Co.*, 24 F. Supp. 490, 492-94 (W.D. Pa. 1938), and the unauthorized lifting of

information regarding government bonds from a competitor's wire service, *Bond*

*Buyer v. Dealers Digest Publg Co., Inc.*, 25 A.D.2d 158 (N.Y. App. Div. 1966).[11]

   *Goldstein*, which Google neither cites nor discusses, makes plain what this Circuit understood in *NBA*: that the Copyright Clause limits state action only to the extent that Congress has relied on this power to preempt the state's action by statute. That issue is one that this Circuit squarely addressed in *NBA*. *NBA*, 105 F.3d at 852.

   In light of the historical use of the misappropriation doctrine by the states,

---

[11]  *See also, e.g., Stewart Title of Cal. v. Fidelity Nat'l Title Co.,* 279 Fed. Appx. 473 (9th Cir 2008) (upholding misappropriation causes of action against use of contract forms); *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.*, 683 F.2d 704 (2nd Cir. 1982) (upholding a preliminary injunction preventing defendant's use of plaintiff's stock index); *Assoc. Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461 (S.D.N.Y. 2009) (denying defendant's motion to dismiss misappropriation claim based upon copying of news stories); *Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.,* No. 08-cv-2135, 2009 U.S. Dist. LEXIS 87261, at *11-16 (M.D. Pa. Sept. 23, 2009) (holding that misappropriation survives preemption, but defendant's copying of obituaries was not sufficiently destructive to satisfy the *NBA* elements); *Pollstar v. Gigmania Ltd.*, 170 F. Supp. 2d 974, 979-80 (E.D. Cal. 2000) (republishing concert information lifted from plaintiff's website); *Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.*, 73 F. Supp. 2d 1044, 1050 (E.D. Mi. 1999) (finding the existence of the tort, but holding that plaintiff had failed to establish destructive competition); *Lynch, Jones & Ryan, Inc. v. Standard & Poor's*, 1998 N.Y. Misc. LEXIS 334, at *6-7 (N.Y. Sup. Ct. June 15, 1998) (holding plaintiff's complaint stated a claim for "hot news" misappropriation when defendant redistributed information regarding changes in national retail sales gathered by the plaintiff); *cf. Forest2Market, Inc. v. Am. Forest Mgmt.*, 05-cv-423, 2008 U.S. Dist. LEXIS 33185, at *9-18 (W.D.N.C. April 21, 2008) (finding that plaintiff's claims for breach of contract and misappropriation of trade secrets based upon defendant's copying of timber prices from plaintiff's website were not preempted by copyright law).

Google's assertion that *INS* threatens the "complex ecosystem" of news reporting cannot bear scrutiny. Over the years, courts and legislatures confronted challenges to information services created by changes in technology, such as the telegraph, the phonograph record, the radio broadcast, or television news. *See supra* p. 15 n. 11. Despite the longstanding existence of the misappropriation tort, development of the descendants of these technologies has continued at a rapid pace and shows not the slightest inclination of stopping. Where the use of those technologies threatens the existence of a fact-based information service, *Feist* expressly recognizes the applicability of unfair competition law. 499 U.S. at 354.

## II.    Amici's Request that This Court Reverse *NBA* is Barred by Second Circuit Precedent.

*Stare decisis* notwithstanding, Google charges ahead undeterred and urges this panel to "re-visit *Motorola* and repudiate the tort" (Google Br. at 10-12; *see also* Fly Br. at 34). It is, however, black-letter law in this Circuit that absent an intervening Supreme Court decision or similar legal event overruling a prior panel decision, panels of this Circuit are bound by prior panel opinions. *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004).

In *NBA*, this Court already determined the extent to which the policy of the copyright law as expressed in section 301 displaced New York's misappropriation

16

law.  *See NBA,* 105 F.3d 850-52.  As the above discussion of *Goldstein* makes plain, the Copyright Clause has no independent preemptive effect save that given it by statutory enactment.  *NBA's* thorough analysis of Congress's intent to preempt New York's misappropriation tort procedurally and substantively forecloses Google's suggestion.

## III.   Laws Protecting Information Services From Destructive, Anticompetitive Behavior Are Consistent With the First Amendment.

A state's power to enact misappropriation statutes or enforce misappropriation doctrines under its common law is not without constitutional limit.  Governmental regulations that affect free speech interests must, of course, pass muster under the First Amendment.  These protections, while substantial, are not absolute.

The government has a strong interest in preserving incentives for compilers to make information available to the public.  Many fact-based products and services, such as those produced by Reed Elsevier, are enormously expensive to produce, and easy and inexpensive to copy.  The preservation of these incentives through the misappropriation doctrine neither stops the flow of factual information to the public nor interferes with the public's ability to comment or opine on the news of the day: it prevents economically destructive conduct by those who wish

17

to reap where they have not sown.  *NBA*, 105 F.3d at 852 ("[INS's conduct] would render [AP's] publication profitless, or so little profitable as in effect to [**37] cut off the service by rendering the cost prohibitive in comparison with the return.") (quoting *INS*, 248 U.S. at 241) (alterations in original).  If those who create these products and services become unable to obtain a financial return on their investments of time, effort, and money, because, for example, of wholesale copying and republication of  Lexis' federal case law database, the incentive to produce those potentially valuable products will be removed and the public will lose access to those products and services.  Ensuring these incentives continue to exist represents a substantial government interest, and a fully legitimate exercise of the state's police power.  *See, e.g., Zacchini v. Scripps-Howard Broad. Co.,* 433 U.S. 562, 575 (1977) (noting that the economic value of a performance is tied to control of its publication).

  *Feist* and *INS*'s silence regarding the interplay between unfair competition and free speech principles stemmed not from judicial obliviousness to First Amendment doctrine, but from common-sense recognition that free speech protection is not absolute.  "The First Amendment does not provide such categorical protection. . . . [T]he fact that an entity is a news publication engaging in speech activity does not, standing alone, relieve such entities of their obligation

18

to obey intellectual property laws." *Sarl Louis Feraud Int'l v. Viewfinder,* 489 F.3d 474, 480 (2d. Cir. 2007); *see also Zacchini,* 433 U.S. at 575 ("The First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent."); *S. F. Arts & Ath. v. U. S. Olympic Comm.,* 483 U.S. 522, 540 (refusing to find First Amendment violation where Congress gave U.S. Olympic Committee exclusive rights to the word "Olympic").[12]  In such instances, the First Amendment does not prevent governments from protecting businesses against unfair competition, rather the First Amendment and unfair competition laws comfortably co-exist.

The misappropriation doctrine that this Court recognized in *NBA* fits comfortably within this paradigm.  The tort furthers the government's legitimate interest in combating the economic effects of unfair and destructive business practices on the incentive for an original compiler of information to provide that service to the public.  New York's misappropriation doctrine is intended to grant "enforceable rights to afford greater encouragement to the production of works of benefit to the public." *Zacchini,* 433 U.S. at 576; *see Bond Buyer*, 25 A.D.2d at 159-60.  It is content and viewpoint-neutral, and as a result receives intermediate

_____

[12]  "There is no question that [defendant's] unauthorized use could undercut the USOC's efforts to use, and sell the right to use, the word [Olympics] in the future… Such an adverse effect on the USOC's activities is directly contrary to

19

First Amendment scrutiny, which requires that the legislation further a "substantial governmental interest" in a way that is "narrowly" drawn to further that interest. *United States v. O'Brien,* 391 U.S. 367, 377 (1968).

The five-part test set out in *NBA* renders the cause of action narrowly tailored.[13] It ensures that those who expend substantial resources in aggregating and compiling time sensitive, factual information intended to be made commercially available to its customers are not harmed by destructive, unauthorized free-riding by their competitors in a way that defeats the original compiler's incentives to continue make the fruits of their labor available.[14] Thus,

---

Congress' interest."  483 U.S. at 535.

[13]  The elements set forth in *NBA* are:

> "(i) a plaintiff generates or gathers information at a cost; (ii) the information is time sensitive; (iii) a defendant's use of the information constitutes free riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiff; and (v) the ability of other parties to free ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened."

*The National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 845 (2nd Cir. 1997).

[14]  Google's reliance on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), *Smith v. Daily Mail Publ'g Co.,* 443 U.S. 97 (1979), and *Florida Star v. B.J.F.,* 491 U.S. 524 (1989) (see Google Br. at 21), is quite beside the point.  In *Bartnicki*, for example, the Supreme Court balanced the public's interest in obtaining information about a labor dispute against the government's interest in protecting privacy through its

although the five hot-news factors ensure that the cause of action at issue here is

narrowly tailored, it does not exhaust legislative authority to prevent incentive-

destroying appropriations in other contexts.

Finally, *amicus* believes that the district court did not abuse its broad

equitable discretion by crafting the injunction, especially given the clear record of

appellant obtaining appellees' recommendations through admittedly covert means.

The district court recognized that the valuable recommendations produced by

plaintiffs serve a public interest by helping shape the way the market performs, and

that the public has an interest in the continued production of such

recommendations.  (Mar. 18th Opinion and Order at *93.)  Given that public

interest, as well as the appellant's credibility and its history of unauthorized

takings, the district court was entitled to craft an injunction that was broader than it

---

wiretap laws, 532 U.S. at 529; *cf. Smith*, 443 U.S. at 102 (striking down a statute
barring public disclosure of name of child in juvenile proceeding); *Florida Star*,
491 U.S. at 524 (striking down statute barring any public disclosure of identity of
sexual assault victim).  In this instance, there is no question that the public will
continue to receive appellees' reports.  (Mar. 18th Opinion and Order at *95-98).
The District Court's finding that the appellees' incentive to continue to engage in
their reports' publication makes the balancing of interests a straightforward one.
*Id.*  There will be, of course, instances where the degree of economic harm is not
sufficient to override First Amendment interests.  *See e.g., C.B.C. Distribution &
Mktg., Inc. v. MLB Advanced Media*, 505 F.3d 818, 824 (8th Cir. 2007) (finding
the appellant's 1st Amendment interests in using professional baseball statistics
trumped the players' right to publicity because the use of the statistics would not
threaten the players incentive to play the game).

could have in the absence of such factors.  *See Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 424 (2nd Cir. 2004) (stating that a court may craft greater equitable relief when it is in "furtherance of the public interest than where only private interests are involved."); *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477-78 (2nd Cir. 1996) (holding that court was justified in considering prior violations of securities law and witness's credibility when deciding to issue an injunction).  Its injunction should be upheld.

## IV.    Conclusion

For the foregoing reasons, the judgment of the District Court should be AFFIRMED.

Respectfully Submitted,

_____ /S/ _____

Christopher A. Mohr
MEYER, KLIPPER & MOHR, PLLC
923 15th St., N.W.
Washington, DC  20005
(202) 637-0850
July 22, 2010                          *Attorney for Amicus*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. Pro. 29(d) and 32(a)(7)(B), because this brief contains 5,238 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  The word count was measured by the word-processing program used to prepare the brief, Microsoft Word 2007.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. Pro. 32(a)(5) and the typestyle requirements of Fed. R. App. Pro. 32(a) (6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2008 in 14 point Times New Roman Font.

_____ /S/ _____

Christopher A. Mohr

Attorney for *Amicus*

Dated:  July 22, 2010

## CERTIFICATE OF SERVICE & CM/ECF FILING

I hereby certify that I caused the foregoing Brief *Amicus Curiae* of Reed

Elsevier Inc. in Support of Affirmance to be served on counsel for Plaintiffs-

Appellees and Defendant-Appellant via Electronic Mail generated by the Court's

electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to

Local Appellate Rule 25.1.

*Counsel for Plaintiffs-Appellees:*

Mr. Rich, Robert Bruce, Esq.: bruce.rich@weil.com,
MCO.AppellateCourts@weil.com

Mr. Bloom, Jonathan, Esq.: jonathan.bloom@weil.com,
MCO.AppellateCourts@weil.com

Ms. Eskow, Lisa R., Esq.: lisa.eskow@weil.com,
MCO.AppellateCourts@weil.com

Mr. Marks, Benjamin Ely, Esq.: benjamin.marks@weil.com,
MCO.AppellateCourts@weil.com, Sabrina.Perelman@weil.com

*Counsel for Defendant-Appellant:*

Mr. Ostrager, Glenn F, Esq.: gostrager@ocfblaw.com,
jbroitman@ocfblaw.com, jbroit@optonline.net,
ogmez27@gmail.com, ogmez@verizon.net, rgomez@ocfblaw.com

Mr. Broitman, Joshua, Esq. : jbroitman@ocfblaw.com

Mr. Gomez, Roberto, Es: rgomez@ocfblaw.com, rgomez@verizon.net

*Counsel of Amici Curiae:*

Mr. Deutsch, Andrew Lawrence, Esq.: andrew.deutsch@dlapiper.com,
DocketingNewYork@dlapiper.com

Mr. Edick, William Douglas Esq.: will@pickdjin.com

Mr. Kaufman, Henry R., Esq.: hrkaufman@aol.com

Mr. LoBue, Robert P, Esq.: rplobue@pbwt.com, mcolitigation@pbwt.com

Ms. Sullivan, Kathleen M., Esq.: kathleensullivan@quinnemanuel.com

Mr. Von Lohmann, Fred, Esq.: fred@eff.org, lety@eff.org, corynne@eff.org

I certify that an electronic copy was uploaded to the court's electronic filing system.  Six hard copies of the foregoing Brief *Amicus Curiae* of Reed Elsevier Inc. in Support of Affirmance were sent to the Clerk's office by hand delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
Unites States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8500

On this 22nd day of July 2010.

/S/

Christopher Mohr